[Cite as *State v. Edwards*, 2025-Ohio-641.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                 No. 113793

    v.                                    :

TIRRELL EDWARDS,                        :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 27, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-686377-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Kimberly Kendall Corral and Gabrielle M. Ploplis, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant Tirrell Edwards ("Edwards") appeals his convictions for murder, felonious assault, and domestic violence, arguing that he acted in self-defense. He raises the following assignments of error:

1. Appellant was denied the effective assistance of counsel in violation of the Sixth Amendment of the U.S. Constitution.

   a. Trial counsel was ineffective for failing to raise a Daubert Challenge or object on the basis of the best evidence rule as to video forensics testimony.

   b. Trial counsel was ineffective for failing to object during the State's closing argument and for failing to request a curative instruction and move for a mistrial following the State's improper commentary throughout the trial.

2. The trial court erred in instructing the jury that they become the government upon receiving instruction to begin deliberations.

3. The State engaged in prosecutorial misconduct in violation of the appellant's constitutional right to a fair trial under the U.S. and Ohio Constitutions.

   a. The State engaged in prosecutorial misconduct when it improperly suggested that the appellant had been violent with the victim in the past.

   b. The State engaged in prosecutorial misconduct when it repeatedly referred to the victim as a battered woman.

   c. The State engaged in prosecutorial misconduct when it improperly suggested without any supporting evidence that appellant slid the knife under the victim's body after her death during closing arguments.

   d. The State engaged in prosecutorial misconduct when it improperly stated that appellant was lying in closing arguments.

4. The trial court erred in overruling defense objection with regard to the state's improper characterization of victim as a battered woman, and inappropriate and overly prejudicial inquiry into Evid.R 404(B) evidence.

5. The trial court erred in failing to provide a curative jury instruction or order a mistrial following the prosecution's improper statements.

6. The trial court erred in failing to provide adequate self-defense jury instruction for every charged count, including accompanying verdict forms which required self-defense language.

7. The trial court erred in denying appellant's Crim.R. 29 motion or acquittal when the State failed to prove beyond a reasonable doubt that appellant was not acting in self-defense.

8. Appellant's convictions are against the manifest weight of the evidence.

9. The State failed to present sufficient evidence to prove each and every element beyond a reasonable doubt.

10. The cumulative effect of multiple errors deprived appellant of his constitutionally guaranteed right to a fair trial under the federal and state constitutions.

{¶ 2} After a careful review of the applicable law and facts, we affirm Edwards's convictions.

## I. Factual and Procedural History

{¶ 3} This appeal arises from the shooting death of Amanda Williams ("victim"), who was Edwards's fiancée at the time of her death.

{¶ 4} In October 2023, the victim resided with her adult daughter, Tyler Williams ("Tyler"), her granddaughter, and Edwards, with whom she had had a relationship for several years. The victim was a hairstylist, and on October 8, 2023, she had traveled to Columbus for a hair show. Edwards texted her the next morning, but she did not respond to his text. He later called her and they argued. She then called her cell phone service provider and asked for Edwards to be removed from her plan.

**{¶ 5}** When Edwards learned of this, he went to a cell phone store and obtained a new phone number. He then returned to the residence.

**{¶ 6}** Later that day, the victim returned from Columbus, and she and Edwards began arguing again. Edwards videoed some of their interactions on his cell phone. At some point, Edwards removed two guns from his nightstand and took them to his vehicle. He then returned to the residence.

**{¶ 7}** The victim came up the stairs holding a knife in one hand and a long Bic lighter in the other. Edwards asked her if she was going to stab him, and the victim said that she was going to defend herself.

**{¶ 8}** The victim told Edwards to leave. She took his cell phone from him and began stabbing it with the knife. Edwards retrieved a firearm that he claimed belonged to the victim and shot her six times.

**{¶ 9}** Tyler heard the shots and went upstairs to where the victim and Edwards were. She saw her mother lying on the ground and Edwards doing something on a cell phone. Edwards told her to go downstairs and call an ambulance. He did not allow her to go near the victim.

**{¶ 10}** Tyler ran outside to see if the police or ambulance had arrived yet. She tried to get back into the residence, particularly because her 4-year-old daughter was still inside, but Edwards would not let her.

**{¶ 11}** Edwards called 911 from the victim's phone and reported that he had killed his fiancée.

{¶ 12} When Warrensville Heights Police Department officers arrived, Edwards and Tyler were standing outside of the residence. Edwards told police to go inside and that the victim was holding a knife under her body. As he was being arrested, he told police that there were videos on his cell phone that were evidence of what had occurred. He told police that the victim had held him hostage with the knife.

{¶ 13} One of the officers did find a knife underneath the victim's body. The knife was moved so that EMS could attempt to render assistance to the victim.

{¶ 14} An autopsy was performed, and it was determined that all six of the shots fired hit the victim. Two of the bullets were fatal shots — one to her back and one to her neck that immediately paralyzed her.

{¶ 15} Edwards was charged with aggravated murder in violation of R.C. 2903.01(A); murder, in violation of R.C. 2903.02(A); murder, in violation of R.C. 2903.02(B); felonious assault, in violation of R.C. 2903.11(A)(1); felonious assault, in violation of R.C. 2903.11(A)(2); and domestic violence, in violation of R.C. 2919.25(A). All of the charges except for the domestic violence count had accompanying one- and three-year firearm specifications.

{¶ 16} Edwards filed a notice of intent to argue self-defense and requested a separate verdict form for the defense. The trial court denied the motion for a separate verdict form.

{¶ 17} The case proceeded to trial before a jury. The State presented the testimony of Tyler; Officer Selena Colon, who responded to the scene; Thomas Ciula

("Ciula"), a qualified video expert from the Cleveland Division of Police; Officer Christopher Jordan, who responded to the scene and was the first officer to enter the residence and find the victim; Officer John Videc, whose vehicle Edwards was detained in after police arrived on the scene and who mirandized and spoke with Edwards; Dr. Elizabeth Mooney, a deputy medical examiner for Cuyahoga County; Lisa Moore, a DNA expert from the Cuyahoga County Medical Examiner's Office; Kristen Koeth, a ballistics expert from the medical examiner's office; Curtiss Jones, a trace evidence expert from the medical examiner's office; and Lt. Parris Johnson, the lead investigator on the case.

{¶ 18} Among a number of other exhibits, the State presented three videos from Edwards's cell phone, referred to during testimony as Video 1, Video 2, and Video 3 (State's exhibit Nos. 222, 223, and 224). Video 1 and Video 2 depicted snippets of the interaction between Edwards and the victim before the shooting. Video 3 occurred seven minutes later and recorded the sounds of the shooting but did not show it because the phone was being moved and the lens was covered at times. The State also presented an enhanced version of Video 3, known as Rotated Video 3, that had been rotated and cropped by Ciula, along with half-speed versions of Video 3 and Rotated Video 3 (State's exhibit Nos. 225, 226, and 227).

{¶ 19} At the close of the State's case, Edwards moved for acquittal pursuant to Crim.R. 29. The court denied the motion.

{¶ 20} Edwards then testified on his own behalf. He recounted how he and the victim had argued that evening and that at one point she had told him to "get

out." (Tr. 836.) He did not want to leave because he had to work early in the morning. She then said that he could stay but that he should "sleep with one eye open." (Tr. 837.) Edwards testified that he saw the victim reach toward his nightstand, which is where he had two firearms. He took them out of the drawer and put them into his vehicle outside. He stated, though, that he ultimately was not really concerned that she was going to do anything violent. (Tr. 837.)

{¶ 21} Edwards stated that when he came back inside, he heard the victim on the phone asking for the police to come to the residence. (Tr. 838.) Edwards testified that at that point, he decided to leave and went upstairs to get his work clothes. (*Id.*) He stated that he then heard the victim open a kitchen drawer, and she came upstairs with a knife. (Tr. 840.) He took his phone out and began recording.

{¶ 22} Video 1 depicted the victim upstairs with the knife. Edwards asked what she was doing with the knife, and she stated that she was going to defend herself. (Tr. 841.) He responded, "Defend yourself from what?" (*Id.*) Edwards testified that the victim charged at him, and he stopped recording and put down the phone. (*Id.*)

{¶ 23} Edwards stated that the victim snatched the phone from him and began stabbing at the screen of the phone with the knife. (Tr. 843-844.) He testified that he remembered jumping over to the victim's side of the bed and reaching under the mattress to where she kept a firearm. (Tr. 846.) He testified that he shot her because she was coming at him with the knife and he could not get away. (Tr. 847.)

{¶ 24} He found his phone near where the victim fell after being shot and tried to call 911, but he could not because the screen on the phone had been damaged. Tyler came upstairs and started screaming. She wanted to see her mother, but Edwards told her to go downstairs and call 911. Edwards testified that he did not render any medical aid to the victim because he did not know how; he did not believe that Tyler did either. (Tr. 850.)

{¶ 25} On cross-examination, counsel for the State questioned Edwards about the knife involved, noting that Video 1 appeared to show the victim putting the knife down on a ledge. Edwards stated that he had not seen her put the knife down but that she must have picked it back up at some point and began coming toward him. (Tr. 867.)

{¶ 26} Counsel for the State questioned Edwards about why the victim obtained the knife. He denied knowing what she would have been defending herself from and stated that the two had never fought. (Tr. 871.) Edwards further denied ever having been violent with the victim before. (*Id.*) The State asked Edwards if he had ever done anything to make the victim feel like a battered woman. Edwards responded that the victim was not the "type of woman" to "go for being a battered woman." (Tr. 876.)

{¶ 27} Counsel for the State then asked Edwards about whether he had done anything in November 2020 to make the victim feel like a battered woman. Edwards was shown a text message that the victim had written to him on November 27, 2020, where the victim referred to an altercation between herself and Edwards and had

stated that she felt like a battered woman.  He acknowledged that he did remember, in that instance, doing something to her that made her feel like she was a battered woman.  (Tr. 878.)  He also acknowledged that he had responded that he was sorry for doing that to her but denied that he had been violent with her.  (Tr. 878-879.)  Edwards was shown further text messages and asked if he "remember[ed] now saying sorry for kicking [the victim] in the head?"  He said that he believed it was the face, not the head, but that he did remember saying that and that he had also said that he had not wanted "things to go that far."  (Tr. 880.)

{¶ 28} Edwards was further questioned about Video 2, in particular where the victim said, "What are you doing with these covers"? He acknowledged that she was talking about his side of the bed and that the covers had been moved there. (Tr. 881-882.)  He denied, though, that he had had to move those covers to retrieve the gun. (Tr. 882.)  He stated that he merely had to slide his hand under the mattress to retrieve the gun.  (*Id.*)

{¶ 29} Edwards admitted that when the victim was hitting his phone with the knife, he did not tell her to stop or tell her that he would shoot her if she did not stop. (Tr. 888.)  He also admitted that when the victim was hitting his phone, she was looking down at the phone.  (Tr. 887-888.)

{¶ 30} The jury found Edwards not guilty of aggravated murder, but guilty of all other charges, including the attendant firearm specifications.

{¶ 31} The court imposed an aggregate sentence of 24 years to life in prison. Edwards then filed the instant appeal.

## II. Law and Argument

{¶ 32} For ease of discussion, we will address Edwards's assignments of error out of order.

## A. Overruling Objection; Evid.R. 404(B)

{¶ 33} In his fourth assignment of error, Edwards argues that the trial court erred in overruling the defense's objection to the State's characterization of the victim as a battered woman and for its inappropriate and prejudicial inquiry into Evid.R. 404(B) evidence.

{¶ 34} The admission or exclusion of evidence is within the purview of the trial court, and we review these decisions for an abuse of discretion. *State v. Hughes*, 2021-Ohio-2764, ¶ 39 (8th Dist.). An abuse of discretion occurs if a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 35} Edwards asserts that counsel for the State improperly suggested that Edwards had previously been violent with the victim and improperly referred to her as a "battered woman." Specifically, Edwards refers to questioning on cross-examination about whether the victim had needed to defend herself from him. Edwards contends that it was "the [S]tate's own opinion" that the victim was a "battered woman" or, at least, felt like one. The State argues that its questioning was based upon statements made in text messages sent between Edwards and the victim that were used for impeachment purposes after he stated that he did not know why the victim obtained the knife or felt the need to defend herself.

{¶ 36} On direct examination, Edwards was asked about the exchange in Video 1 where he questioned the victim as to why she had a knife, and she responded that she was going to defend herself. He testified that he then asked her, "Defend [her]self from what?" (Tr. 841.) The State argues that this opened the door for it to inquire on cross-examination about why the victim felt the need to defend herself. Edwards testified that he did not know what she was defending herself from, denied that the two had fought that night, and denied that he had previously been violent with the victim. He acknowledged that the two had had altercations in the past but denied that he had ever done anything to intentionally hurt her. (Tr. 875-876.)

{¶ 37} Counsel for the State then asked if Edwards had ever done anything to make the victim feel like a battered woman. He denied that he had and said that she was "not that type of woman." (Tr. 876.)

{¶ 38} Edwards was presented with State's exhibit No. 234, which contained text messages between himself and the victim. After reviewing the page that contained text messages from November 2020, Edwards acknowledged that he did, "in that instance," remember doing something that made the victim feel like a battered woman. (Tr. 878.) He stated that he remembered her sending the text message to him and that he told her that he was sorry for "doing that to her." He further admitted that he remembered apologizing for kicking the victim in the face and that he had not wanted "things to go that far." (Tr. 880.)

{¶ 39} Evid.R. 613 governs impeachment by self-contradiction and permits questioning of a witness about a prior statement they made that is inconsistent with their current testimony.

{¶ 40} Subsection (B) of the rule outlines the admissibility of extrinsic evidence used for impeachment; however, when a witness admits making a prior statement, it is not an abuse of discretion for the trial court to exclude extrinsic evidence of the statement. *State v. Martinez*, 2013-Ohio-1025, ¶ 16 (8th Dist.), citing *State v. Eason*, 1994 Ohio App. LEXIS 4636, *13 (8th Dist. Oct. 13, 1994), citing *State v. Johnson*, 10 Ohio App.3d 14 (10th Dist. 1983); *see also State v. Pierce*, 2011-Ohio-4873, ¶ 82 (2d Dist.) (no need for extrinsic evidence if the witness admits making the conflicting statement).

{¶ 41} Edwards admitted to the statements in the text messages, and the State did not seek admission of the text messages in question. State's exhibit No. 234 contained all of the text messages between the parties; however, the State only sought to admit pages 48-57 of the exhibit, which reflected text messages between the victim and Edwards on the day of the shooting. The pages containing the text messages used for impeachment were not admitted as part of State's exhibit No. 234. Accordingly, since the text messages in question were not admitted and were only used for impeachment, we need not analyze that section of the rule.

{¶ 42} We find that the text messages reflected statements made by Edwards that were inconsistent with his testimony on cross-examination, and the State

properly used Evid.R. 613 to impeach him. The trial court did not err in overruling Edwards's objection to the impeachment questioning.

{¶ 43} Edwards further argues that any questioning regarding the text messages exchanged between the victim and Edwards concerning the November 2020 incident should not have been admitted because it constituted prior bad acts evidence in violation of Evid.R. 404(B).

{¶ 44} Evid.R. 404(B) prohibits the use of "other crimes, wrongs, and acts . . . to prove the character of the accused in order to show that he acted in conformity therewith." This type of evidence is commonly referred to as "propensity evidence" because its purpose is to demonstrate that the accused has a propensity to commit the crime in question. *State v. Curry*, 43 Ohio St.2d 66, 68 (1975), citing 1 *Underhill's Criminal Evidence*, Section 205, at 595 (6th Ed. 1973).

{¶ 45} As noted above, the text messages in question were not admitted as evidence. We have concluded that Edwards was properly asked about them on cross-examination for purposes of impeachment. Edwards was questioned about his prior statements after he had specifically stated that he did not know why the victim obtained the knife or what the victim would have wanted to defend herself from. The State was not attempting to *prove* that the victim was a "battered woman," but was simply using her words and Edwards's responses thereto for impeachment purposes.

{¶ 46} There is nothing in the record that would indicate the State's purpose in asking about the earlier text messages was to demonstrate that Edwards was

acting in conformity with his past behavior. The text messages were utilized solely during cross-examination and were not offered in the State's case-in-chief.

{¶ 47} We find there was no violation of Evid.R. 404(B), and the trial court did not abuse its discretion in overruling Edwards's objection.

{¶ 48} Edwards's fourth assignment of error is overruled.

## B. Prosecutorial Misconduct

{¶ 49} In his third assignment of error, Edwards argues that counsel for the State engaged in prosecutorial misconduct when he (1) impermissibly used prior bad acts against him, (2) impermissibly referred to the victim as a "battered woman," (3) argued to the jury that Edwards slid the knife under the victim's body after he shot her, and (4) improperly argued that Edwards was a liar.

{¶ 50} The relevant question in reviewing a claim of prosecutorial misconduct is whether the comments made by the prosecutor "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Froman*, 2020-Ohio-4523, ¶ 114, quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). In answering that question, the reviewing court considers "whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights." *Id.*, citing *State v. Maxwell*, 2014-Ohio-1019, ¶ 243. In evaluating prejudice, the court considers "the effect that the misconduct had 'on the jury in the context of the entire trial.'" *Id.*, quoting *State v. Keenan*, 66 Ohio St.3d 402, 410 (1993).

### 1. Prior Acts of Violence and Reference to Victim as a "Battered Woman"

{¶ 51} Edwards argues that counsel for the State engaged in misconduct when he questioned Edwards about a prior altercation in 2020 and referred to the victim as a "battered woman."

{¶ 52} As set forth above in our analysis of the fourth assignment of error, the court did not err in overruling Edwards's objection to questioning about the November 2020 text messages. Thus, we cannot find that the prosecutor acted improperly in questioning Edwards on these issues.

{¶ 53} We note that counsel for the State did not outright label the victim a "battered woman"; rather, the prosecutor was careful to say that the victim had "felt like" one — an assertion that Edwards admitted she had said to him in text messages. The State was not seeking to prove that the victim was a battered woman but was using her own words and Edwards's responses thereto in order to impeach him. In the context of a prosecutorial-misconduct analysis, we cannot find that the prosecutor's statement prejudicially affected Edwards's rights or that they so infected the trial with unfairness as to make the resulting conviction a denial of due process.

### 2. Factual Suggestion Regarding the Knife

{¶ 54} Edwards also contends that, during the State's closing argument, the prosecutor improperly suggested without any supporting evidence that Edwards

slid the knife under the victim's body after her death. In particular, Edwards cites the following statements made by counsel for the State:

> Think back to Video 3. Think back to what you hear after the shooting and she falls. You hear silence. You hear Tyler say, "What are you all doing?" And you hear rustling or something like sliding or something. Think also to what he said today. As she fell, she hit that plastic thing with the knife and must have broke it. Ladies and gentlemen, as she fell she couldn't hold anything with her hands. Make that make sense because it doesn't.

> I submit to you think about this for a second. He does not check the body, he just looks at her and has decided she's dead and has immediately accepted it. How on earth does he know right where the knife is? Maybe he slid it under her body, maybe that's what you hear on Video 3. How does he know right where that knife is?

(Tr. 1009.)

{¶ 55} The State contends that it was permitted to ask the jury to make inferences based upon the evidence presented. The State points to the following evidence supporting the inference: (1) the sliding sound heard on the video after the victim was shot and lying on the ground; (2) Edwards told the responding officers that the victim was gripping the knife in her hand when she fell and that they should go look for the knife under her; (3) Edwards testified that when the victim fell, he did not check her for signs of life and he was on her left side, so he would not have been able to see the knife gripped underneath her in her right hand; (4) Dr. Mooney, the medical examiner, testified that the gunshot wound to the victim's neck severed her spinal cord and caused her to immediately lose control of any of her extremities; thus she would have been unable to continue gripping the knife; (5) the crime-scene photographs showed blood on both of the victim's hands; and (6) the DNA expert

testified that the knife had no visible signs of blood on it, while the lighter, which had been seen in the victim's other hand, was very bloody.

{¶ 56} The test for prosecutorial misconduct during closing arguments is whether the remarks made by the prosecutor were improper and, if so, whether they prejudicially affected a substantial right of the accused. *State v. Williams*, 2003-Ohio-4164, ¶ 44, citing *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). We review a prosecutor's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. *State v. Treesh*, 90 Ohio St.3d 460, 466 (2001). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Gapen*, 2004-Ohio-6548, ¶ 92 (2004), quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶ 57} Edwards's counsel did not object to the statements at issue during the trial. When trial counsel fails to object to alleged instances of prosecutorial misconduct, the alleged improprieties are waived, absent plain error. *State v. White*, 82 Ohio St.3d 16, 22 (1998), citing *State v. Slagle*, 65 Ohio St.3d 597, 604 (1992).

{¶ 58} Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Notice of plain error, however, "'"is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."'" *State v. Black*, 2019-Ohio-4977, ¶ 21 (8th Dist.), quoting *State v. Mallory*, 2018-Ohio-1846, ¶ 17 (8th Dist.), quoting *State v. Long*, 53 Ohio St.2d 91, 93 (1978), paragraph two of the syllabus.

{¶ 59} "A prosecutor is permitted to comment during closing argument on what the evidence has shown and what reasonable inferences he or she believes may be drawn from it." *State v. Moore*, 2010-Ohio-518, ¶ 31 (8th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 165 (1990). Here, the prosecutor's argument set forth the evidence properly admitted at trial and suggested a reasonable inference for the jury to draw from that evidence, as outlined above. The suggestion that Edwards may have placed the knife under the victim's body did not constitute prosecutorial misconduct.

### 3. Suggestion that Edwards Was Lying

{¶ 60} Edwards further argues that during the State's closing argument, the prosecutor improperly said that Edwards was "lying" when he said that the victim was holding him hostage with the knife.

{¶ 61} In general, a prosecutor has considerable latitude in his closing argument, and the prosecutor's conduct during closing argument "must be considered in light of the entire case to determine whether the accused was denied a fair trial." *State v. Powell*, 2012-Ohio-2577, ¶ 149, citing *State v. Maurer*, 15 Ohio St.3d 239, 266, 269 (1984).

{¶ 62} A prosecutor may "fairly comment on the credibility of witnesses based on the witnesses' testimony at trial." *State v. Williams*, 2012-Ohio-1741, ¶ 12 (8th Dist.), citing *State v. Price*, 60 Ohio St.2d 136, 140 (1979). Further, while they are prohibited from stating a personal belief that a defendant is lying, the prosecutor "may suggest that the evidence demonstrates that the defendant is lying." *State v.*

*Skipper*, 2003-Ohio-3531, ¶ 45 (8th Dist.), citing *State v. Draughn*, 76 Ohio App.3d 664, 670 (5th Dist. 1992).

{¶ 63} During closing argument, the prosecutor stated:

> Remember today's story, ladies and gentlemen, "She held me hostage that whole time from the beginning of Video 1 to the end of Video 3 when I killed her." That's 11:31 to 11:38, 7 minutes of her holding him hostage which begins with her putting the knife down and walking away from it. I'll use the defendant's words right now, "Make it make sense," because that sure doesn't. How on earth is he being held hostage by a knife over across the room? He's not, he is lying.

(Tr. 1003-1004.)

{¶ 64} When a prosecutor states in closing argument that a defendant is lying and when that statement is based on evidence within the record and not an expression of personal belief or opinion, this court has found such statement to be proper. *State v. Powell*, 2014-Ohio-2048, ¶ 72 (8th Dist.); *Williams* at ¶ 12; *Skipper* at ¶ 45. The assertion that Edwards lied in his testimony was based on an inference that his testimony was fabricated for trial. As such, we cannot say that the comment was wholly improper, was based on the prosecutor's personal belief, or that such comment precluded Edwards from receiving a fair trial when considering the remark in the context of the entire trial.

{¶ 65} Edwards has not demonstrated prosecutorial misconduct in any of the instances cited, and his third assignment of error is overruled.

## C. Failure to Provide Curative Instruction or Declare Mistrial

{¶ 66} In his fifth assignment of error, Edwards argues that the trial court erred in failing to provide a curative instruction or declare a mistrial after counsel

for the State made certain improper statements. Edwards does not specifically identify the statements at issue, but we will assume he is referring to the statements cited in his third and fourth assignments of error.

{¶ 67} It does not appear that Edwards's trial counsel requested a curative instruction or moved for a mistrial. Nevertheless, because we held that the prosecutor's statements were not improper, the fifth assignment of error is overruled.

### D. Ineffective Assistance of Counsel

{¶ 68} In his first assignment of error, Edwards argues that his trial counsel was ineffective by (1) failing to raise a *Daubert* challenge against the State's video forensic evidence; and (2) failing to object to the State's closing argument, request a curative instruction, and/or move for a mistrial in response to the State's improper commentary throughout the trial.

{¶ 69} In order to establish a claim of ineffective assistance of counsel, a defendant must prove (1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668 (1984).

{¶ 70} In evaluating a claim of ineffective assistance of counsel, a court must give great deference to counsel's performance. *Id.* at 689. "A reviewing court will strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." S*tate v.*

*Pawlak*, 2014-Ohio-2175, ¶ 69 (8th Dist.). Thus, "[t]rial strategy or tactical decisions cannot form the basis for a claim of ineffective counsel." *State v. Foster*, 2010-Ohio-3186, ¶ 23 (8th Dist.), citing *State v. Clayton*, 62 Ohio St.2d 45 (1980). Additionally, the failure to do a futile act cannot be the basis for claims of ineffective assistance of counsel, nor could such a failure be prejudicial. *State v. Kilbane*, 2014-Ohio-1228, ¶ 37 (8th Dist.).

## 1. *Daubert* Challenge

{¶ 71} Edwards argues that his counsel was ineffective for failing to challenge the video enhancement by Ciula (Rotated Video 3) through a *Daubert* challenge. He contends that the State offered unqualified, untested methodology based upon unauthenticated records that prejudiced him.

{¶ 72} In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court held that the trial court must act as a "gatekeeper" to ensure both the relevance and reliability of expert scientific testimony before admitting it. In order to aid in determining the threshold reliability of such testimony, *Daubert* identified several factors for courts to consider in addressing the issue. These factors, along with *Daubert's* approach to the reliability issue, were later adopted by the Supreme Court of Ohio in *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998), and reaffirmed in *State v. Nemeth*, 82 Ohio St.3d 202 (1998).

{¶ 73} Noting the general principle that "expert scientific testimony is admissible if it is reliable and relevant to the task at hand," the *Miller* Court stated:

In evaluating the reliability of scientific evidence, several factors are to be considered: (1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance.

*Miller* at 611, citing *Daubert* at 593-594. Under Evid.R. 702(C), the issue for the trial court is not whether the testimony is correct but whether the underlying data, methods, and processes are such that they can be trusted to generate reliable information. *Id.* at 614. The standard is reliability, not infallibility.

{¶ 74} Edwards raises the following issues with Ciula's testimony:

[N]one of Ciula's testimony as to his qualifications provides any insight into what expertise he has as to his video editing methodology. Tr. 363. This testimony is extremely vague and provides no insight into precisely what expertise is required for video-editing that a layperson does not have. No testimony was presented as to community standards in video forensic analysis, and no testimony as to accuracy or reliability. Rather, it appears that Ciula, cloaked in the term "expert" merely altered the video evidence in a way that any layperson could do. It is entirely unclear how Ciula's editing altered the integrity of what was actually occurring in the video.

(Edwards's brief p. 16.)

{¶ 75} Edwards's argument in this assigned error is muddled. On the one hand, he asserts that his trial counsel should have asserted a *Daubert* challenge, which would examine the reliability of the evidence. But Edwards actually seems to be arguing that Ciula was not an expert and the editing that he performed on Video 3 could have been done by any lay person.

{¶ 76} Ciula testified that he runs the video, audio, and forensics library of the Cleveland Division of Police. When asked if he had any specialized training or

schooling or work experience that allowed him to have such a position, he stated that he had "over 750 classroom training hours. I've done this job for about 16 years now. I've worked in excess of 1,000 cases . . . ." He explained that he was able to perform enhancement on video that the average person is unable to do. Ciula further noted that he had been qualified as an expert in the area of video analysis in every trial in which he had testified. Edwards did not object to the State's request to qualify Ciula as an expert in video analysis. (Tr. 364-365.)

{¶ 77} We note that the video editing that Ciula performs has been reviewed under Evid.R. 702 and found to relate to matters beyond the knowledge or experience possessed by lay persons and based upon technical or other specialized information. *See State v. Harris*, 2024-Ohio-1579, ¶ 63 (8th Dist.). This court has previously determined that his qualifications "rise to the level of expert in his field[ ]" and that he "has testified as an expert forensic video specialist in multiple cases in the Cuyahoga County Common Pleas Court." *Id*. at ¶ 64. S*ee also State v. Fields*, 2020-Ohio-4740, ¶ 61 (8th Dist.), citing *State v. George,* 2016-Ohio-7886 (8th Dist.); *State v. McMiller*, 2016-Ohio-5844 (8th Dist.); *State v. Warmus*, 2014-Ohio-928 (8th Dist.).

{¶ 78} Ciula described the type of work he performs with video evidence as follows:

> Every case is different, but the job that I do is to try to get that video evidence and get it in a way that makes sense to the detectives investigating; that makes sense to the Prosecutors and the defense in terms of what's there. And ultimately for you, ladies and gentlemen, to

see whatever was captured by an individual video system that's being — that's appropriate, that's germane to the case.

(Tr. 363-364.)

{¶ 79} With regard to the editing he conducted on Video 3, Ciula testified:

Video 3 was a video that was brought to me from a cell phone, an Apple cell phone. It was in a format that I had to re-wrap to be able to work with in my facility, and I did. This was a video that was shot, as I said, with a cell phone camera.

So the issue with this particular video was the fact that it was being hand-held so it was being moved around. There were points in this video where there were things blocking the lens, so what I did with this was to do a process that gets used for hand-held cameras, for body-worn cameras, which is to try to stabilize, to align that image so you could better see what's going on.

You have two parts to a video; there is the video itself and then there is the canvass it's on, for all intents and purposes. Ordinarily we like video to be shown at the biggest possible dimensions possible so you don't change that canvass, but in something like this we want to put it on a larger canvass because it rotates. So to be able to see it I take it a frame-at-a-time, I draw an artificial Bullseye, for all intents and purposes, a crosshair and say that will be the center point.

And then a frame-at-a-time take that and try to turn it in such a way that you are seeing the image right-side-up as we're looking at each other. What that means is — to get that is you will see sometimes that image, the whole video itself turns sideways, slants all that but the picture you are seeing will be normal orientation, you'll see it top to bottom.

(Tr. 366-367.)

{¶ 80} After careful consideration, we are unable to conclude that counsel's failure to challenge the reliability of the video-forensics evidence amounted to ineffective assistance of counsel. There is nothing in the record that calls into question the reliability of Ciula's editing of Video 3 and creation of Rotated Video 3.

Ciula provided ample testimony concerning his extensive experience in video editing and explained how he rotated and centered the video to better depict what was occurring between Edwards and the victim — specialized knowledge and skills that he acquired through his training and experience.

{¶ 81} Under such circumstances, there is no indication that Rotated Video 3 would have been excluded had a *Daubert* hearing been requested.

{¶ 82} Moreover, Edwards offered the videos on his cell phone as evidence to police to support his claim of self-defense. Given that the original Video 3 was difficult to watch and discern what was happening, Edwards would also benefit from any enhancement that better reflected what occurred on that fateful night. As such, we cannot say that Edwards's trial counsel's decision to forego a challenge to the reliability and accuracy of Rotated Video 3 was not the product of trial strategy, which we will not second-guess.

{¶ 83} Edwards also makes a limited argument that Rotated Video 3 violates the "best evidence rule" under Evid.R. 1001 through 1008. However, beyond citing general case law, Edwards fails to provide any specific assertions in support of this argument. App.R. 16(A)(7) requires an appellant to support each assignment of error with the reasons in support of the argument, including citations to legal authorities, statutes, or the record. As Edwards has failed to provide any support for this argument, we will disregard it.

## 2. Failure to Object to Statements by Prosecutor

{¶ 84} We determined above that the prosecutor's statements were not improper; as such, objecting would have been a futile act. As noted above, "[t]he failure to do a futile act cannot be the basis for a claim of ineffective assistance of counsel, nor could such a failure be prejudicial." *State v. Knox,* 2013-Ohio-1662, ¶ 20 (8th Dist.), citing *State v. Ford*, 2007-Ohio-5722, ¶ 9 (8th Dist.).

{¶ 85} Edwards has not demonstrated that his counsel was ineffective, and his first assignment of error is overruled.

## E. Court's Instruction

{¶ 86} In his second assignment of error, Edwards argues that the trial court erred by telling the potential jurors they would become "the government" in its opening remarks. Specifically, the trial court stated as follows:

> And if you think about it like this, what else do you do to give back to your country? We know you vote; that's why you're here. Hopefully you pay your taxes, and perhaps you volunteer at a church or do something in your community. But absent serving the armed forces or perhaps a much lesser model, being an elected official, this is your only way to give back to the government and so we certainly appreciate those of you for being here.
>
> This is very direct and significant. And when the door to the jury room closes behind you, the 12 of you become the government and the 12 of you are our judicial system . . . .

{¶ 87} Edwards does not cite to any case law precluding such an analogy. He argues that he was prejudiced by this statement because the assertion that the jury "[became] the government" essentially "lowered the burden of the [S]tate to prove

its case and indicated [to] the jury that they are one in [sic] the same as the prosecution."

{¶ 88} We note that the court's statement to the jury was made in its initial remarks at the opening of trial. The court was impressing upon the potential jurors the importance and value of jury service as a civic duty. When telling the jury that they would become "the government," the court was clearly referring to the judicial branch of the government and indeed, told the potential jurors that, as a jury, they would become the judicial system; it never implied that they were the same as the State. It appears that the trial court was simply trying to impress upon the potential jurors the gravity of their duty.

{¶ 89} Moreover, these remarks were made to the entire venire before the jury was selected. The selected members of the jury were later instructed as to the respective burdens of proof. "A jury is presumed to follow the instructions given to it by a trial court." *State v. Griffin*, 2024-Ohio-4894, ¶ 140 (8th Dist.), citing *State v. Garner* 74 Ohio St.3d 49, 59 (1995).

{¶ 90} We cannot find that the court erred in its remarks to the jurors, and Edwards's second assignment of error is overruled.

## F. Self-Defense Instruction and Verdict Form

{¶ 91} In his sixth assignment of error, Edwards asserts that the trial court erred in denying his motion for a separate verdict form on self-defense. He contends that the jury-verdict forms given did not correlate with the provided jury

instructions because they did not require the jury to show that they had determined that the State proved that Edwards did not act in self-defense.

{¶ 92} Edwards does not dispute that the trial court's jury instructions, including its instructions on the defense of self-defense, were full and complete, accurately stated the law, and contained all of the jury instructions that were relevant and necessary for the jury to weigh the evidence and discharge its duty as the trier of fact. We must presume that the jury followed these instructions. *See, e.g., State v. Willis*, 2019-Ohio-537, ¶ 19 (8th Dist.).

{¶ 93} Edwards has not pointed us to any legal authority requiring a separate verdict form for the defense of self-defense, nor can we find any. And we are not alone in this fruitless quest. *See State v. Huish,* 2023-Ohio-365, ¶ 93 (10th Dist.); *State v. Jones*, 2020-Ohio-3367, ¶ 94 (8th Dist.), citing *State v. McClain*, 2011-Ohio-1623, ¶ 40 (5th Dist.) ("We . . . find no law in the state of Ohio requiring the jury verdict forms to provide a place for a jury to reject an affirmative defense."); *State v. Hobbs,* 2008-Ohio-4658, ¶ 18 (5th Dist.) (finding no error in the trial court's omission of affirmative defense of inability to pay on verdict form, noting that "we have found nothing which requires or suggests that an affirmative defense be set forth on the verdict form"); *see also State v. Reeds*, 2008-Ohio-1781, ¶ 53, 62 (11th Dist.) (while acknowledging that "it may be argued that inclusion of a separate finding relating to self-defense would ensure clarity," finding no error where the verdict form did not contain a separate finding for self-defense); *State v. Black*,

2012-Ohio-2874, ¶ 42 (5th Dist.) (no plain error where the trial court did not provide the jury with a separate verdict form for the defense of self-defense).

{¶ 94} Accordingly, Edwards's sixth assignment of error is overruled.

### G. Crim.R. 29 Motion for Acquittal

{¶ 95} Edwards's seventh assignment of error argues that the trial court erred in denying his Crim.R. 29 motion for acquittal that argued that the State failed to prove beyond a reasonable doubt that he was not acting in self-defense.

{¶ 96} Pursuant to Crim.R. 29(A), a court "shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses." Because a Crim.R. 29 motion questions the sufficiency of the evidence, "[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence." *State v. Tenace*, 2006-Ohio-2417, ¶ 37.

{¶ 97} However, in *State v. Messenger*, 2022-Ohio-4562, the Supreme Court of Ohio explained that "a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id*. at ¶ 25. Because the defendant bears the burden of producing evidence to support a claim of self-defense, a self-defense claim is not subject to a sufficiency-of-the-evidence claim but is, instead, reviewed based on the manifest weight of the evidence.

{¶ 98} Accordingly, we decline to consider Edwards's sufficiency argument with regard to his claim of self-defense, and his seventh assignment of error is overruled.

## H. Manifest Weight of the Evidence

{¶ 99} In his eighth assignment of error, Edwards argues that the verdicts were against the manifest weight of the evidence because the State failed to introduce any reliable evidence that he was not acting in self-defense when he shot and killed the victim.

{¶ 100} To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We will reverse a conviction as against the manifest weight of the evidence "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. McLoyd*, 2023-Ohio-4306, ¶ 40 (8th Dist.), quoting *Thompkins* at 387.

{¶ 101} In support of his assertion that the verdicts were against the manifest weight of the evidence, Edwards cites arguments that we have already analyzed and rejected above, to wit: the admission of the video enhancement and claimed inappropriate comments by the prosecutor. Even if we had not already found that

these assertions lack merit, these arguments do not relate to the manifest weight of the evidence.

{¶ 102} Edwards's remaining contentions are that the only other witness present at the time of the shooting did not see the altercation and that "all" of the forensic evidence supported his defense.  He does not elaborate on either of these assertions and does not cite to parts of the record that demonstrate "all" of the claimed favorable forensic evidence.  Appellate courts are not "obligated to search the record or formulate legal arguments on behalf of the parties."  *State v. Quarterman*, 2014-Ohio-4034, ¶ 19.  *See also Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.), quoting *Cardone v. Cardone*, 1998 Ohio App. LEXIS 2028 (9th Dist. May 6, 1998) ("'If an argument exists that can support this assigned error, it is not this court's duty to root it out.'").  "An appellate court is not obligated to construct or develop arguments to support a defendant's assignment of error and will not guess at undeveloped claims on appeal." (Cleaned up.)  *State v. Jones*, 2020-Ohio-3367, ¶ 68 (8th Dist.).

{¶ 103} Nevertheless, we can determine that this is not the exceptional case where the jury lost its way.  The jury viewed the videos taken by Edwards of the altercation, heard the testimony of police officers and the medical examiner, and considered Edwards's explanation of the events through his own testimony.

{¶ 104} A jury is free to believe all, some, or none of the testimony of each witness testifying at trial.  *Jones* at ¶ 85; *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.).  Moreover, Edwards's convictions are not against the manifest weight of the

evidence merely because the jury found the State's version of the events to be more believable than appellant's theory of the case. *State v. Jallah*, 2015-Ohio-1950, ¶ 71 (8th Dist.), quoting *State v. Hall*, 2014-Ohio-2959, ¶ 28 (4th Dist.) ("[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state."). The jury did not lose its way in resolving the conflicting theories based on the evidence presented at trial, and Edwards's convictions were not against the manifest weight of the evidence.

{¶ 105} The eighth assignment of error is overruled.

## I. Sufficiency of the Evidence

{¶ 106} Edwards's ninth assigned error argues that the State failed to present sufficient evidence to prove each and every element beyond a reasonable doubt. Edwards does not provide any specific arguments in support of this assignment of error and simply presents general case law on the sufficiency standard.

{¶ 107} The failure to present a separate argument on each claim of an appeal is a violation of App.R. 16(A)(7). We therefore disregard this assigned error. *See Cleveland v. Hall*, 2015-Ohio-2698, ¶ 14 (8th Dist.), citing *State v. Cassano*, 2012-Ohio-4047, ¶ 2 (8th Dist.). Edwards's ninth assignment of error is overruled.

## J. Cumulative Effect

{¶ 108} In his tenth assignment of error, appellant contends that while he maintains that each of his assignments of error warrant reversal, if this court were

to disagree, the cumulative effect of all of the errors deprived him of his right to a fair trial.

> Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 132; *State v. Garner*, 74 Ohio St.3d 49, 64, 1995-Ohio[-]168, 656 N.E.2d 623 (1995). However, the doctrine of cumulative error is inapplicable when the alleged errors are found to be harmless or nonexistent. *Id*.; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 48.

*State v. Shine*, 2018-Ohio-1972, ¶ 141 (8th Dist.).

{¶ 109} As we have determined that there were no errors committed in the trial of this matter, appellant's final assignment of error is overruled.

## K. Firearm Specification Sentences

{¶ 110} At oral argument, counsel for the State noted that, after the briefs had been filed in this matter, the Supreme Court of Ohio released *State v. Beatty*, 2024-Ohio-5684, which addressed the imposition of consecutive sentences for more than two firearm specifications. The parties were ordered to file supplemental briefs addressing the application of *Beatty* to the instant matter.

{¶ 111} In *Beatty*, the defendant had been convicted of multiple felonious assault charges and four attendant firearm specifications. The trial court imposed three-year prison terms for each of the four firearm specifications, to be run consecutively under R.C. 2929.14(B)(1)(g). On appeal, Beatty argued that only two of the specifications could be run consecutively. The Twelfth District upheld the sentence, and Beatty appealed to the Supreme Court of Ohio.

{¶ 112} Preliminarily, we note that *Beatty* is a plurality opinion.  As we have previously stated:

> "A plurality opinion is '[a]n opinion lacking enough judges' votes to constitute a majority but receiving more votes than any other opinion.' *Black's Law Dictionary* 1125 (8th Ed.2004).  A plurality opinion from this court has 'questionable precedential value inasmuch as it * * * fail[s] to receive the requisite support of four justices * * * in order to constitute controlling law.'"  *State v. Gwynne*, 2023-Ohio-3851, ¶ 68, fn. 6, citing *Kraly v. Vannewkirk*, 69 Ohio St.3d 627, 633 (1994).  "[A] plurality opinion is not binding authority."  *Nascar Holdings, Inc. v. Testa*, 152 Ohio St.3d 405, 2017-Ohio-9118, 97 N.E.3d 414, ¶ 18, citing *Hedrick v. Motorists Mut. Ins. Co.*, 22 Ohio St.3d 42, 44 (1986), overruled on other grounds, *Martin v. Midwestern Group Ins. Co.*, 70 Ohio St.3d 478 (1994).

*State v. Hayes*, 2023-Ohio-4119, ¶ 20, fn. 1 (8th Dist.).  "[A] court may rely on a plurality opinion when it finds the opinion persuasive."  *Nascar Holdings, Inc. v. Testa*, 2017-Ohio-9778, ¶ 18.

{¶ 113} The outcome of *Beatty,* 2024-Ohio-5684, turned on differing interpretations of R.C. 2929.14(B)(1)(g), which provides as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 114} The lead opinion in *Beatty* interpreted R.C. 2929.14(B)(1)(g) to mean that any additional firearm-specification prison term after the first two was

discretionary and not a *mandatory* prison term and, therefore, could not be imposed consecutively.

{¶ 115} The dissenting opinion in *Beatty* contended that the lead opinion misconstrued the term "mandatory," stating:

> "When the word 'mandatory' is considered in the context of the scheme, it is clear that the word refers not to a trial-court judge's decision whether to impose prison terms for third and fourth firearm specifications but to the nature of those prison terms. A mandatory prison term is a specific term that must be served in its entirety."
>
> When the trial-court judge decided to impose prison terms for the third and fourth firearm specifications of which Beatty was convicted, the terms were mandatory prison terms. Under R.C. 2929.14(C)(1)(a), the terms had to run consecutively to one another and to the other firearm-specification prison terms and consecutively to and prior to the sentences for the underlying felonies.

*Beatty*, ¶ 43-44 (Deters, J., dissenting).

{¶ 116} In the instant matter, Edwards was convicted of three, three-year firearm specifications under R.C. 2941.145(A), which refers to a "three-year *mandatory* prison term." (Emphasis added.) The trial court sentenced him to a prison term of three years on each specification, all to run consecutively.

{¶ 117} Here, like in *Beatty,* 2024-Ohio-5684, there is no dispute that the trial court was required to impose prison terms for the first two firearm specifications and that the court was required to run those terms consecutively. There is also no dispute that the trial court had the discretion to impose an additional prison term for the third firearm specification. The question addressed by *Beatty* is whether the additional prison term could also be imposed consecutively.

{¶ 118} In its supplemental brief, the State urges us to reject the reasoning of the lead opinion in *Beatty*, arguing that it is a plurality opinion that misreads R.C. 2929.41(A), which provides the general presumption of concurrent service of prison terms.

{¶ 119} Unsurprisingly, Edwards encourages us to follow *Beatty* and find that only two of the three firearm specification sentences could be imposed consecutively. Edwards asks us to remand this matter to the trial court to amend his sentence to follow *Beatty* and impose the third prison term concurrently.

{¶ 120} This court has addressed the issue of sentences for multiple firearm specifications under R.C. 2929.14(B)(1)(g) in *State v. Adkins*, 2021-Ohio-1294 (8th Dist.):

> R.C. 2929.14(C)(1)(a) generally requires consecutive service of all firearm specifications. R.C. 2929.14(B)(1)(b) provides an exception to the consecutive service of firearm specifications mandated by R.C. 2929.14(C)(1)(a), if they were committed as part of the same act or transaction. However, R.C. 2929.14(B)(1)(b) provides an exception to the exception "as provided in R.C. 2929.14(B)(1)(g)." Thus, R.C. 2929.14(B)(1)(g), which requires consecutive prison terms on the two most serious specifications in certain specified situations, only applies if the underlying felonies and attendant firearm specifications were committed as part of the same act or transaction. *See, e.g., State v. Burton*, 2018-Ohio-95 (8th Dist.) (Court must impose consecutive prison terms on firearm specifications that were not committed as part of the same act or transaction.). If the felonies and attendant firearm specifications were committed separately, then the trial court must follow the default rule set forth in R.C. 2929.14(C)(1)(a), which requires mandatory consecutive service of all firearm specifications.

*Id.* at ¶ 23.

{¶ 121} R.C. 2929.14(C)(1)(a) provides that when a trial court imposes a prison term on a firearm specification, the court must run the prison term consecutively to all other prison terms. *Id.* at ¶ 13. "To sum up the portion of R.C. 2929.14(C)(1) that is pertinent here, if a court imposes a 'mandatory prison term' for a firearm specification, it must be served consecutively to any other 'mandatory prison term' imposed for the enumerated specifications and consecutively to the prison term for the underlying felony to which the specification is attached." *Beatty*, 2024-Ohio-5684 at ¶ 12.

{¶ 122} In addressing the meaning of "mandatory" within the statutes in question, the *Adkins* Court noted as follows:

> R.C. 2929.14(B)(1)(b) and 2929.14(C)(1)(a) are mandatory sentencing provisions because R.C. 2929.14(B)(1)(a) requires the imposition of prison terms on firearm specifications, and R.C. 2929.14(C)(1)(a) generally requires consecutive service of all firearm specifications. And, R.C. 2929.14(B)(1)(g) is mandatory to the extent that it requires the trial court to impose prison terms on the two most serious felonies if the defendant is convicted of at least one of seven specified felonies, including aggravated robbery, and gives the court discretion to impose time on more than two.

*Adkins*, 2021-Ohio-1294, ¶ 15.

{¶ 123} *Adkins* did not specifically address the particular question before us — whether an additional firearm-specification prison term imposed at the court's discretion under R.C. 2929.14(B)(1)(g) may be imposed consecutively. And while we are unable to find a decision out of this court that is directly on point, this district, along with the majority of other appellate districts, have consistently construed R.C. 2929.14(B)(1)(g) to uphold the imposition of consecutive sentences for multiple

firearm specifications. *See State v. Campbell*, 2024-Ohio-1693, ¶ 71 (8th Dist.) (reviewing three firearm-specification prison terms and noting, "[A]lthough the General Assembly did not include the word 'consecutive' in R.C. 2929.14(B)(1)(g), it did, in fact, create an exception to the general rule that a trial court may not impose multiple sentences on firearm specifications for crimes committed as part of the same transaction."); *State v. Brown*, 2015-Ohio-4764, ¶ 19 (8th Dist.) ("In this case, the trial court, as mandated and in an exercise of discretion, imposed consecutive sentences on the firearm specifications attendant to the aggravated robbery charges. We find no error by the trial court."); *State v. Vanderhorst*, 2013-Ohio-1785, ¶ 11 (8th Dist.); *State v. Clay*, 2013-Ohio-4649, ¶ 72 (4th Dist.) (noting that the statute also allowed the court to exercise its discretion to impose any remaining firearm specification prison terms, which it did, and finding that the trial court did not err by ordering the defendant to serve the firearm-specification prison terms consecutively to one another); *State v. Isreal*, 2012-Ohio-4876 (8th Dist.) ("[P]ursuant to R.C. 2929.14(B)(1)(g), sentences for multiple [firearm] specifications should be run consecutive to each other.").

{¶ 124} None of these cases specifically analyzed whether the imposition of a third (or additional) prison term imposed *at the court's discretion* under R.C. 2929.14(B)(1)(g) may be imposed consecutively. While we look to *Beatty,* 2024-Ohio-5684, for guidance, we are not persuaded by the conclusion offered by the lead opinion and its interpretation of the applicable statutes. As noted by the dissent in *Beatty,*

for firearm specifications beyond the first and second, R.C. 2929.14(B)(1)(g) permits the imposition of "*the term specified under [R.C. 2929.14(B)(1)(a)].*" (Emphasis added.) Because Beatty was found guilty of a firearm specification under R.C. 2941.145(A), R.C. 2929.14(B)(1)(a)(ii) provides the "term specified"—three years. But imposition of that term is not permitted unless R.C. 2941.145(A) is satisfied, and R.C. 2941.145(A) makes crystal clear that the specified three-year prison term is mandatory.

*Beatty*, ¶ 41 (Deters, J., dissenting).

{¶ 125} Thus, a prison term imposed for a firearm specification under R.C. 2929.145(A) is mandatory, and under R.C. 2929.14(C)(1)(a), mandatory prison terms imposed for firearm specifications are to be served consecutively. While the court has discretion under R.C. 2929.14(B)(1)(g) regarding whether to impose an additional prison term for a third firearm specification, if it does impose a prison term, the term is mandatory and must be run consecutively.

{¶ 126} In harmony with our prior holdings, we find that the prison term imposed for Edwards's third firearm specification was mandatory, and thus required to be imposed consecutively. We decline to follow the nonbinding authority of *Beatty* or to sua sponte find any error in Edwards's sentence.

{¶ 127} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR