[Cite as *State v. Henderson*, 2026-Ohio-2315.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 115318 |
| AMIER HENDERSON, | : | |
| Defendant-Appellant. | : | |

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART, AND REMANDED
**RELEASED AND JOURNALIZED:** June 18, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-694064-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Timms, Assistant Prosecuting Attorney, *for appellee.*

Elizabeth Miller, Ohio Public Defender, and Assistant Public Defender, Faith M.R. Edwards, *for appellant.*

TIMOTHY W. CLARY, J.:

{¶ 1} Defendant-appellant Amier Henderson ("Henderson") appeals from the juvenile court's finding that Henderson was not amenable to the juvenile court

system and the subsequent decision to grant the State's motion for discretionary transfer to adult court. Henderson also appeals from the trial court's sentence and argues that the sentence was contrary to law because the trial court did not properly consider R.C. 2929.19(B)(1)(b)'s youth mitigating factors. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I. Factual and Procedural History

{¶ 2} This case stems from an incident that occurred on September 11, 2023, when Henderson attempted to steal a vehicle and fled from the Shaker Heights police.

## A. Prior Adjudications and Commitments

{¶ 3} Prior to that time, on November 30, 2022, Henderson was adjudged delinquent on charges of robbery, theft, telecommunications fraud, and failure to comply. Cuyahoga J.C. No. DL 22-109205. In February 2023, pursuant to that adjudication, the juvenile court placed Henderson on community-control sanctions and ordered his participation in Cognitive Behavioral Intervention Center ("CBIC") programming — the most intensive probation supervision available in the juvenile system. Henderson violated his probation when he attacked the driver transporting him to CBIC, resulting in his being unsuccessfully discharged from the program. In April 2023, two juvenile cases, Cuyahoga J.C. Nos. DL 23-104157 and DL 23-104512, were filed against Henderson that related to stolen vehicles and Henderson was remanded to the juvenile detention center. Henderson underwent hospitalization

for psychiatric care and was diagnosed with depression and suicidal ideations related to his arrest and incarceration. In July 2023, the juvenile court committed Henderson to the emergency temporary care and custody of the Cuyahoga County Division of Children and Family Services ("CCDCFS") and he received a suspended commitment to the Ohio Department of Youth Services ("ODYS").

{¶ 4} On August 1, 2023, the CCDCFS placed Henderson at Lighthouse Youth Services ("Lighthouse"), a youth residential facility in Cincinnati, Ohio. Lighthouse was not a lockdown facility, but Henderson was under the supervision of Cuyahoga County Probation Officer Harrison Brill ("Probation Officer Brill") during his placement there. At Lighthouse, Henderson was diagnosed with attention deficit hyperactivity disorder ("ADHD"), cannabis use, and depression and was to receive individualized counseling, group counseling, and cognitive behavioral treatment. On September 10, 2023, Lighthouse notified Probation Officer Brill that Henderson had left the facility and had been missing for 48 hours.

## B. September 11, 2023 Incident

{¶ 5} On September 11, 2023, the Shaker Heights Police Department received a telephone complaint that a young Black male dressed in a gray hoodie was attempting to break into a vehicle at an apartment complex. The police were dispatched, and Patrolman Ward and Officer Brian Borgione ("Officer Borgione") stopped Henderson, who was in the vicinity of the apartment complex, wearing a gray hoodie. The officers engaged verbally with Henderson, and during that time, Officer Borgione noticed a phone charger and screwdriver in Henderson's pocket.

{¶ 6} When Patrolman Ward went to his police cruiser to verify Henderson's identity, Henderson attempted to flee on foot. Officer Borgione chased after Henderson, and when Officer Borgione was approximately ten to 15 feet behind Henderson, he heard a loud noise. As Officer Borgione continued running behind Henderson, he heard the sound again and realized that Henderson had twice discharged a firearm at him. The second discharged bullet entered a house where several people resided; no one was injured.

{¶ 7} While running from the police, Henderson attempted to enter a house but his actions were curtailed by the homeowner. Henderson ended up on the top of a garage where the police, including Patrolman Ray Douglas ("Patrolman Douglas"), interacted with the youth before arresting him. During the exchange with Patrolman Douglas, Henderson admitted that he had shot at the officers and stated that he did not mean to harm them. Henderson also informed the officers that they would have to shoot him because he was not going back to jail. A firearm, shell casing, phone charger, and screwdriver were discovered in the back yard where Henderson had shot at Officer Borgione.

{¶ 8} Henderson was arrested on September 11, 2023, and remanded to the juvenile detention center on September 14, 2023. On September 18, 2023, a ten-count complaint was filed in the juvenile court alleging that 17-year old Henderson was a delinquent child for committing Count 1, felonious assault in violation of R.C. 2903.11(A)(2) with a furthermore clause because the victim was a peace officer; Counts 2 and 3, improperly discharging a firearm into a habitation in violation of

R.C. 2923.161(A)(1); Count 4, having a weapon while under disability in violation of R.C. 2923.13(A)(2); Count 5, breaking and entering in violation of R.C. 2911.13(B); Count 6, attempted grand theft in violation of R.C. 2923.02 and 2913.02(A)(1); Count 7, carrying a concealed weapon in violation of R.C. 2923.12(A)(2) with a furthermore clause; Count 8, possessing criminal tools in violation of R.C. 2923.24(A), with a furthermore clause; Count 9, criminal damaging or endangering in violation of R.C. 2909.06(A)(1); and Count 10, inducing panic in violation of R.C. 2917.31(A)(3). Counts 1, 2, and 3 included one- and three-year firearm specifications; Counts 5 and 6 included a one-year firearm specification; and Counts 1 through 7 contained forfeiture of a weapon specifications.

## C. Probable Cause Hearing

{¶ 9} On December 21, 2023, the juvenile court conducted a probable-cause hearing and heard testimony from Officer Borgione. Officer Borgione discussed the September 11, 2023 incident and testified consistently with the above facts. Portions of Officer Borgione's and Patrolman Douglas's body-camera footage from the September 11, 2023 incident were shown. The evidence demonstrated that Henderson was involved in a prior robbery, and thus, he was under a weapon disability when the September incident occurred. The court found probable cause that Henderson committed Counts 1 through 8 of the complaint and the commission of those counts would constitute felonies if they had been committed by an adult.

**D. Amenability Hearing**

{¶ 10} An amenability hearing was held on July 25, 2024. The State submitted Henderson's Juv.R. 30 psychological evaluation prepared on February 26, 2024, by Dr. Lynn Williams ("Dr. Williams"), a forensic psychologist with the Cuyahoga County Juvenile Diagnostic Clinic. Dr. Williams and Probation Officer Brill testified on Henderson's behalf.

**1. Dr. Williams**

{¶ 11} Dr. Williams testified that she had interviewed Henderson's guardian ad litem ("GAL"), sister, and Henderson. Dr. Williams testified that Henderson grew up in a difficult environment where he observed his mother tasered by police and pistol-whipped by an assailant during a robbery; experienced the loss of a brother to drowning; and experienced the death of his grandmother. Additionally, the family had unstable housing and Henderson's mother suffered from mental-health and substance-abuse issues and had a criminal history. Dr. Williams stated that being raised in an unstable home can affect brain development; cause increased behavioral difficulties, aggression, depression, or mental-health issues; and affect academic performance, the ability to regulate emotions, and attachment issues.

{¶ 12} After Henderson was arrested for the charges in the instant case in September 2023, he was placed in the juvenile detention center where he was diagnosed with ADHD, post-traumatic stress disorder ("PTSD"), and an unspecified anxiety disorder and placed on the mental-health docket. Dr. Williams testified that an individual with PTSD is more reactive and has a more difficult time managing his

or her emotions and behaviors, and she stated that Henderson's leaving Lighthouse without permission could have been a response to PTSD. Dr. Williams spoke about a report from December 2023 that indicated Henderson's frequent fights with his peers resulted in his relocation within the juvenile detention center.

{¶ 13} Dr. Williams testified that Henderson qualified for an IEP for reading comprehension and he earned his high school diploma and began taking college courses while at the juvenile detention center. According to Dr. Williams, Henderson did not have an intellectual development disorder or psychiatric disturbance that impaired his ability to understand reality.

{¶ 14} Dr. Williams also testified about a desistance study that reported high-level youth offenders usually peak between the ages of 18 and 21, but they then desist in delinquency over time, with only 6-10% of the youths becoming life-long offenders. The desistance study indicated that the incarceration of youths in an adult facility could increase rearrest rates and increase antisocial tendencies. Dr. Williams agreed that the study provided risk assessments and trends but could not anticipate the future behavior of individuals, and she stated that an individual's past and current behavior may be better indicators of his potential future behavior.

{¶ 15} On February 26, 2024, Dr. Williams performed the Risk Sophistication Treatment Inventory ("RSTI") and Structured Assessment of Violence Risk in Youth ("SAVRY") tests on Henderson. On the RSTI scale of sophistication-maturity, Henderson scored 96%, exhibiting a higher level of sophistication and maturity as compared to other juvenile offenders. The test

demonstrated Henderson's development of personal autonomy and self-determination, his capacity to make decisions with reasonable and sound judgment, and his awareness of his emotions. Dr. Williams's test results indicated Henderson applies his sophistication and maturity in a primarily antisocial, criminogenic manner.

{¶ 16} As to the RSTI scale of amenability, Dr. Williams stated that Henderson's test score of 33% placed him in the middle-offender range as compared to other juvenile offenders, with zero being the least likely that the individual would be amenable to treatment. Dr. Williams testified that Henderson's characteristics were primarily unfavorable for amenability. Dr. Williams stated that Henderson's graduation from high school and participation in college classes — which occurred after her testing — would have increased his amenability score and decreased his risk for violence. Dr. Williams also stated that Henderson's unprovoked assault of a youth in his housing unit, which occurred after her testing, would have been a negative indicator. Dr. Williams could not quantify the potential change in Henderson's test results without retesting him.

{¶ 17} Dr. Williams testified that Henderson's characteristics in favor of amenability included no court involvement prior to the age of 15; some of his legal charges included codefendants; Henderson held employment for more than a year; Henderson helped his mother pay household expenses; and Henderson received his high school diploma. The following characteristics weighed against Henderson's amenability: several of Henderson's criminal cases were completed without

codefendants showing Henderson was the primary actor; Henderson failed to engage in court-ordered interventions such as CBIC and residential placement at Lighthouse; Henderson left Lighthouse without permission and failed to attend court hearings in violation of probation; Henderson failed to conform with behavioral expectations at home, school, and while on probation; Henderson accumulated additional charges while on probation; Henderson engaged in fights while housed at the juvenile detention center; and Henderson experienced significant family instability because of his mother's mental-health and substance-abuse issues.

{¶ 18} Dr. Williams stated that the SAVRY test results indicated a high risk for future violence.

**2. Probation Officer Brill**

{¶ 19} According to Probation Officer Brill, Henderson was initially placed on community-control sanctions in November 2022.

{¶ 20} Probation Officer Brill testified about Henderson's initial behavioral issues at the juvenile detention center in September 2023, followed by a "good stretch" that resulted in his assignment to "Level 4" from January through July 2024. Probation Officer Brill also stated that because of Henderson's involvement with several physical assaults in July 2024 — following the juvenile court's finding of probable cause — he was moved back to probation-level housing.

### 3. Juvenile Court's Findings

{¶ 21} At the conclusion of the amenability hearing, the juvenile court announced that it found Henderson was not amenable to care or rehabilitation within the juvenile system. The court found the relevant factors in favor of transfer, R.C. 2152.12(D)(5), (6), (7), (8), and (9), outweighed the single factor against transfer — R.C. 2152.12(E)(7) — and the court ordered the transfer of Henderson's case to the adult court.

{¶ 22} R.C. 2152.12(D)(5)-(9) factors that weighed in support of Henderson's transfer to adult court are as follows:

> (D) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:
>
> . . .
>
> (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.
>
> (6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.
>
> (7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.
>
> (8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 23} In support of factors (D)(5) and (D)(6), the court stated that at the time of the alleged offenses, Henderson possessed a firearm that he allegedly discharged at Officer Borgione and he was under community-control sanctions. As to factor (D)(7) — whether the results of prior juvenile sanctions or programs indicate rehabilitation will not occur in the juvenile system — the court stated:

> Per what's been testified to and my understanding there was OhioRISE[']s tried to be involved, Children and Family Services was involved, the Children and Family Services Residential Placement at Lighthouse, CBIC, and then also taking into account the Rule 30 psychological evaluation for transfer of jurisdiction and that treatment amenability was 33 percent, middle, regarding any treatment outcome.

Tr. 102.

{¶ 24} The juvenile court found support for factor (D)(8) because Henderson was emotionally, physically, or psychologically mature enough for transfer. As to factor (D)(9), the court found in favor of transfer because there was not sufficient time to rehabilitate Henderson within the juvenile system. Specifically, the juvenile court stated that Henderson was 18 years old, his Juv.R. 30 evaluation indicated a high risk for future violence, and he had multiple prior cases that resulted in probation.

{¶ 25} The juvenile court referenced Henderson's mental-health concerns as the only R.C. 2152.12(E) factor in favor of retaining jurisdiction of the offender. R.C. 2152.12(E)(7) reads:

(E) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

. . .

(7) The child has a mental illness or intellectual disability.

{¶ 26} On July 29, 2024, in conjunction with the juvenile court's finding of nonamenability, the court issued a corresponding judgment entry granting the State's motion for discretionary transfer.

## E. Indictment

{¶ 27} On August 2, 2024, a Cuyahoga County Grand Jury indicted Henderson on Counts 1 through 8 and the related specifications as listed in the original complaint, except Count 7, carrying a concealed weapon, did not include a furthermore clause and Count 8, possessing criminal tools, included a forfeiture of a weapon specification. Henderson pleaded not guilty to the charges on August 16, 2024.

## F. Change-of-Plea Hearing

{¶ 28} On May 28, 2025, the trial court conducted a change-of-plea hearing. Henderson retracted his former pleas and pleaded guilty to amended Count 1, felonious assault with a three-year firearm specification; amended Count 2, improperly discharging a firearm into a habitation, with a three-year firearm specification; Count 4, having a weapon while under disability; amended Count 6, attempted grand theft, with a one-year firearm specification; and Count 7, carrying

a concealed weapon. All counts included a forfeiture specification; the court nolled Counts 3, 5, and 8.

**G. Sentencing Hearing**

{¶ 29} On June 11, 2025, the trial court sentenced Henderson to the following: amended Count 1, three years on the firearm specification to be served prior to and consecutively to a prison term of four to six years on the base charge; amended Count 2, three years on the firearm specification to be served prior to and consecutively to a prison term of four years on the base charge; 30 months on Count 4; amended Count 6, one year on the firearm specification to be served prior to and consecutively to a prison term of six months on the base charge; and 180 days on Count 7. The sentences in Counts 1, 4, and 6 were to be served consecutively to each other, and the sentences in Counts 2 and 7 were to be served concurrently with each other and all other counts. The stated prison term is a mandatory seven years on the firearm specifications to be served prior to and consecutively to an aggregate prison term of seven to nine years on the base charges.

{¶ 30} On July 14, 2025, Henderson filed a notice of appeal, and he now presents two assignments of error:

> Assignment of Error 1: The juvenile court abused its discretion when it transferred Henderson's case for criminal prosecution, without sufficient credible evidence of non-amenability, in violation of R.C. 2153.12(B); U.S. Const., amends. V, XIV; Ohio Const., art. I, § 16; *State v. Nichols*, 2022-Ohio-4276, ¶ 3.

> Assignment of Error 2: Henderson's adult prison sentence is contrary to law because the trial court plainly failed to comply with the mandatory sentencing provisions of R.C. 2929.19(B)(1)(b), which now

require trial courts to consider a child's youth and all of its attendant characteristics before sentencing them to adult prison. Ohio Const., art. I, § 9; R.C. 2929.19(B)(1)(b); *State v. Patrick*, 2020-Ohio-6803.

## II. Legal Analysis

### A. Amenability

### 1. Guilty Plea

{¶ 31} An initial issue is whether Henderson's guilty plea in adult court waived his right to appeal the juvenile court's July 29, 2024 finding that he was not amenable to the juvenile system and granting the State's motion for discretionary transfer to adult court. The State contends that Henderson's guilty plea in adult court waived his right to appeal all nonjurisdictional issues arising at prior stages of the proceedings.

{¶ 32} This court previously found that a guilty plea in adult court does not preclude the individual defendant from subsequently challenging, on appeal, the juvenile court's handling of its amenability decision: "We do not believe a defendant must choose to go to trial, rather than enter a guilty plea, in order to preserve his or her right to challenge errors in the juvenile court's handling of . . . its amenability determination." *State v. D.T.*, 2024-Ohio-4482, ¶ 79 (8th Dist.) ("*D.T. I*").

{¶ 33} The State's reliance on *State v. Griffin*, 2026-Ohio-925 (8th Dist.), which addressed an appeal from a juvenile court's probable-cause determination rather than an amenability finding, is misguided. An appellant's rights following a guilty plea vary depending upon whether his assigned error challenges the juvenile court's probable-cause or amenability finding, and here the issue is Henderson's

ability to challenge his amenability finding. A guilty plea does not waive a defendant's right to challenge his amenability finding in the same way that it waives his right to appeal a juvenile court's probable-cause finding. *See State v. T.S.*, 2024-Ohio-4898, ¶ 67 (8th Dist.), *D.T. I* at ¶ 76 ("'While a defendant, when entering a guilty plea in adult court, admits committing the acts that constituted the offenses to which he pleads guilty (and which were the subject of the juvenile court's probable-cause determination), he does not make any admission as to his competency during prior juvenile proceedings or that he was not amenable to care or rehabilitation in the juvenile justice system.'").

{¶ 34} We recognize that the Ohio Supreme Court granted the State's motion to stay this court's decision in *D.T. I* and accepted for review the State's appeal from that opinion. *See State v. D.T.*, 2024-Ohio-4777 ("*D.T. II*"), and *State v. D.T., 01/28/2025 Case Announcements*, 2025-Ohio-231, ("*D.T. III*").[1] Accordingly, we recognize that if the Ohio Supreme Court overrules the *D.T. I* decision, Henderson's challenge to the juvenile court's amenability decision would be rendered moot. However, according to *D.T. I*, which continues to be controlling as of the publication of this opinion, Henderson's guilty plea in adult court did not waive his subsequent appeal of the juvenile court's amenability finding.

---

[1] *D.T. III* is currently pending before the Ohio Supreme Court.

{¶ 35} Thus, Henderson did not waive his right to challenge this issue because a guilty plea does not act as an admission that he was not amenable to the juvenile system.

**2. Finding of Amenability**

{¶ 36} In his first assigned error, Henderson contends that the trial court abused its discretion when it found he was not amenable to juvenile court sanctions. We disagree.

{¶ 37} "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *In re M.P.*, 2010-Ohio-599, ¶ 11; R.C. 2151.23(A). Pursuant to R.C. 2152.12, under specified circumstances, a juvenile may be subject to a mandatory or discretionary transfer from the juvenile court setting to adult court for criminal prosecution. The instant case involves a discretionary transfer.

{¶ 38} "Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety." *State v. Hanning*, 89 Ohio St.3d 86, 90 (2000); R.C. 2152.12(B). When considering discretionary transfer of a case, the juvenile court determines the child was at least 14 years old at the time of the charged act; the existence of probable cause to believe that the child committed the charged acts; and "the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions."

R.C. 2152.12(B)(1), (2), and (3).  The juvenile court must also order an investigation into the child's social history, education, family situation, and other relevant factors including a mental examination.  R.C. 2152.12(C).

{¶ 39} To evaluate amenability, the juvenile court weighs the R.C. 2152.12(D) statutory factors that support transfer with the R.C. 2152.12(E) factors that weigh against transfer and the court must indicate on the record the specific factors it considered in making its determination.  R.C. 2152.12(B)(3).  No one factor under R.C. 2152.12(D) or (E) is outcome-determinative.  The juvenile court's decision to exercise its discretion to transfer a juvenile to adult court must be supported by a preponderance of the evidence.  *State v. Nicholas*, 2022-Ohio-4276, ¶ 35.  The State bears the burden of persuasion when it asks the juvenile court to transfer a juvenile's case to adult court.  *Nicholas* at ¶ 27.  "Thus, the facts presented to the juvenile court with respect to a discretionary transfer must persuade the court that the juvenile is not amenable to care or rehabilitation in the juvenile system."  *Id.*

{¶ 40} We review a juvenile court's amenability determination for an abuse of discretion.  *Id.* at ¶ 22.  An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority."  *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.  The term abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983); *Johnson*. "'[G]iven the discretion afforded the juvenile court by the legislature in determining a juvenile's amenability to the juvenile justice system, "[i]f there is some rational and

factual basis to support the trial court's decision, we are duty bound to affirm it regardless of our personal views of the evidence.""" *State v. Nicholson*, 2022-Ohio-2037, ¶ 206 (8th Dist.), quoting *State v. Crosby*, 2019-Ohio-2217 ¶ 28 (8th Dist.), quoting *State v. West*, 2006-Ohio-3518, ¶ 10 (4th Dist.).

**{¶ 41}** "'There is no requirement that every factor must be "resolved against the juvenile so long as the totality of the evidence supports a finding that the juvenile is not amenable to treatment."'" *T.S.*, 2024-Ohio-4898, at ¶ 78, quoting *State v. Bryant*, 2024-Ohio-1192, ¶ 16 (2d Dist.), quoting *State v. Haynie*, 1995 Ohio App. LEXIS 517, *13 (12th Dist. Feb. 13, 1995). Here, following the amenability hearing, the juvenile court stated on the record that it found the relevant factors in support of transfer to adult court were R.C. 2152.12(D)(5), (6), (7), (8), and (9). The court explained the application of each factor and noted that R.C. 2152.12(E)(7) was the only factor that weighed against transfer because Henderson had mental-health concerns and a history of trauma.

**{¶ 42}** The record supports the juvenile court's determination on amenability. The record shows that Henderson allegedly discharged a firearm during the September 11, 2023 incident and he was already under community-control sanctions at the time of the alleged offense.

**{¶ 43}** As to his level of maturity, Henderson scored 96% on the RSTI test — exhibiting a higher level of sophistication and maturity as compared to other juvenile offenders — and Dr. Williams testified that Henderson used his high level of sophistication and maturity in a criminogenic manner. Henderson's SAVRY test

results indicated a high risk for future violence, and his RSTI amenability test score of 33% placed Henderson in the middle-offender range as compared to other juvenile offenders, with zero being the least likely that the individual would successfully interact with treatment.

{¶ 44} As to whether there was sufficient time to rehabilitate Henderson within the juvenile system, "[t]he severity of a crime can be a strong indicator that there remains insufficient time to rehabilitate a child offender in the juvenile justice system." *State v. Hennings*, 2019-Ohio-4675, ¶ 25-26 (8th Dist.), citing *State v. Johnson*, 2015-Ohio-96, ¶ 43 (8th Dist.). Henderson was charged under a ten-count complaint that included, but was not limited to, charges of felonious assault, a felony of the first degree, and improperly discharging a firearm into a habitation, a felony of the second degree.

{¶ 45} Additionally, the failure to rehabilitate the juvenile during prior juvenile-court adjudications may support a finding that there is insufficient time to rehabilitate him within the juvenile system. *Crosby*, 2019-Ohio-2217, at ¶ 52 (8th Dist.) ("The court expressly based its decision upon Crosby's prior conduct in the juvenile system and failure of the juvenile justice system to rehabilitate him."). Here, Henderson was adjudicated three prior times in the juvenile system between November 2022 and April 2023 and those adjudications resulted in community-control sanctions. Henderson was previously offered numerous services, including OhioRise, CBIC, and Lighthouse, but he was either unsuccessfully discharged or chose to leave the programs prior to completion. Henderson exhibited good

behavior at the juvenile detention center from January through June 2024, and then initiated an unprovoked assault on another individual in July 2024. Despite his engagement with the juvenile system since November 2022, Henderson allegedly committed the offense on September 11, 2023.

{¶ 46} Henderson also contends that when assessing whether there was sufficient time to rehabilitate him within the juvenile system, the juvenile court should have taken into consideration the programs available within the juvenile system and the fact that he had not been committed to the ODYS prior to the underlying offenses. "While we understand that a sanction such as a disposition to ODYS instead of transfer to adult court would have been more palatable to [Henderson], 'there is no requirement that a juvenile first be committed to the [O]DYS before he may be transferred to the general division for trial as an adult offender.'" *Bryant*, 2024-Ohio-1192, at ¶ 19 (2d Dist.), quoting *State v. Whisenant*, 127 Ohio App.3d 75, 91 (11th Dist. 1998). We also note that in July 2023, Henderson received a suspended commitment to ODYS and he was referred for multiple services, but he did not fully participate in the services or apparently benefit from them. The testimony and evidence supported a finding that there was insufficient time to rehabilitate Henderson in the juvenile system.

{¶ 47} The record indicated Henderson suffered from mental illness, but this was the only factor that weighed against his transfer to the adult court.

{¶ 48} Henderson argues that earning his high school degree, enrolling in college courses, and improving his behavior at the juvenile detention center during

the five months between his Juv.R. 30 evaluation and the amenability hearing indicated increased maturity that would have improved his scores on the RSTI and SAVRY tests. While Dr. Williams stated these accomplishments would increase his amenability score, she could not quantify the improvement in his scores without reassessing him. "The appellate focus is on the totality of the consideration required under R.C. 2152.12(B)-(E)" and we cannot assume the possible improvement of one factor would have changed the juvenile court's finding on amenability. *State v. Jordan*, 2023-Ohio-311, ¶ 12 (8th Dist.). Further, Dr. Williams testified that past and current behaviors are better indicators of an individual's future behavior rather than the RSTI and SAVRY risk-assessment tests.

{¶ 49} Additionally, we find Henderson's contention that the record is insufficient to provide meaningful appellate rule is without merit. The juvenile court identified each applicable R.C. 2152.12(D) and (E) factor and stated in open court the reasoning behind its determination on each factor; the court's findings were supported by the record. Lastly, Henderson's contention that the juvenile court's decision was based upon race is meritless because the juvenile court made no mention of race during the amenability proceedings.

{¶ 50} Based upon the record, a rational, factual basis existed for the juvenile court's findings with respect to the R.C. 2152.12(D) and (E) factors and the court's determination that Henderson was not amenable to the care or rehabilitation of the juvenile system. The juvenile court did not abuse its discretion when it found

Henderson was not amenable to the juvenile system and transferred his case to adult court.  Henderson's first assignment of error is overruled.

**B. Sentencing**

{¶ 51}  In his second assignment of error, Henderson argues his sentence is contrary to law because the trial court did not consider, prior to sentencing him to adult prison, the statutory mitigating youth factors listed in R.C. 2929.19(B)(1)(b).

{¶ 52} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2).  *State v. Marcum*, 2016-Ohio-1002, ¶ 1, 21.  R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, modify, or vacate and remand a felony sentence if the court clearly and convincingly finds either that the record does not support the sentencing court's findings, or the sentence is otherwise "contrary to law."

{¶ 53} R.C. 2929.19(B)(1)(b) requires the trial court to consider additional mitigating factors when, as here, the offender was under the age of 18 at the time the subject offense was committed.  The statute provides, in relevant part:

(B)(1) At the sentencing hearing, the court, before imposing sentence, shall do all of the following:

. . .

(b) If the offense was committed when the offender was under eighteen years of age, in addition to other factors considered, consider youth and its characteristics as mitigating factors, including:

(i) The chronological age of the offender at the time of the offense and that age's hallmark features, including intellectual capacity, immaturity, impetuosity, and a failure to appreciate risks and consequences;

(ii) The family and home environment of the offender at the time of the offense, the offender's inability to control the offender's surroundings, a history of trauma regarding the offender, and the offender's school and special education history;

(iii) The circumstances of the offense, including the extent of the offender's participation in the conduct and the way familial and peer pressures may have impacted the offender's conduct;

(iv) Whether the offender might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, such as the offender's inability to deal with police officers and prosecutors during the offender's interrogation or possible plea agreement or the offender's inability to assist the offender's own attorney;

(v) Examples of the offender's rehabilitation, including any subsequent growth or increase in maturity during confinement.

R.C. 2929.19(B)(1)(b).

{¶ 54} This court has recognized that R.C. 2929.19's mandate that a trial court consider youth mitigating factors is sufficiently similar to the language of R.C. 2929.11 and 2929.12 and, therefore, the trial court need not make specific findings regarding the youth mitigating factors. *State v. Spencer*, 2023-Ohio-3359, ¶ 23-24 (8th Dist.); *see State v. Spears*, 2023-Ohio-187, ¶ 40 (5th Dist.) ("[T]he trial court need not specify findings regarding the factors listed in R.C. 2929.19(B)(1)(b)."). "The consideration of such factors is presumed, 'unless the defendant affirmatively shows otherwise.'" *State v. Moncrief*, 2026-Ohio-1770, ¶ 17, quoting *Spencer* at ¶ 22, citing *State v. Wright*, 2018-Ohio-965, ¶ 16 (8th Dist.). Thus, our review is limited to whether the record affirmatively shows that the trial court failed to consider the youth mitigating factors. *Spears* at ¶ 40.

{¶ 55} During the sentencing hearing conducted on June 11, 2025, the trial court referenced the mitigating youth factors multiple times.[2] The trial court stated that it had received, read, and reviewed defense counsel's sentencing memorandum that addressed, in detail, the R.C. 2929.19(B)(1)(b) youth mitigating factors: "I really read and took to heart your attorney's sentencing memo." June 11, 2025 hearing, tr. 55. The court also stated that "this [was] such a tough case." June 11, 2025 hearing, tr. 55. The court explained that it was familiar with Henderson's early drug use, his impulsivity, and research on youth-brain development, and the court stated that it was empathetic to Henderson's difficult childhood including his mother's mental-health issues and how they impacted the offender. But the court noted that

> [t]here's a difference between walking by a car that has keys in the ignition and jumping in the car and taking off as impulsive behavior of a teenager, and . . . trying to steal another car, getting caught and instead of just eating the fact that you're caught here and you got a gun, one, deciding to run.
>
> That's bad enough, because you, yourself, could have been shot. You, yourself, could have spread — you could put yourself at risk in any number of ways, but to turn and fire not one, but two rounds at a police officer is appalling behavior, and I understand that you're at a time and place where you feel like you have nowhere to go, and you can't get out of it, and you're trying to kill yourself.
>
> I understand that.
>
> But you could have been killed, and then we've got a whole other set of circumstances here.

<hr>

[2] The sentencing hearing addressed Cuyahoga C.P. Nos. CR-24-694064 and 694899. This appeal relates to the sentence in Cuyahoga C.P. No. CR-24-694064, and accordingly, we will only address the sentencing on that specific matter.

You've got the officer now . . . .

June 11, 2025 hearing, tr. 56-57.

{¶ 56} The trial court further stated:

So I've got to weigh all that with, again, the factors with sentencing a juvenile, which is brain development, your age at the time of the offense, your history of trauma, your school and education, and family and peer pressures, and I have to see all of that.

And I am, and I've considered this, and I thought about it long and hard yesterday evening . . . .

I have to weigh all the juvenile factors, but I also have to see everything else that I'm required to weigh under the law.

June 11, 2025 hearing, tr. 58. The trial court again stated it "considered the youth, its characteristics and mitigating factors, pursuant to [R.C.] 2929.[19](B)(1), specifically, you know, 1 through 5." June 11, 2025 hearing, tr. 61.

{¶ 57} The trial court sentenced Henderson on Counts 1, 2, 4, 6, and 7 to a mandatory seven years on the firearm specifications to be served prior to and consecutively to a prison term of seven to nine years on the base offenses, for an aggregate prison term of 14-16 years. The court issued a corresponding judgment entry on June 12, 2025, that stated, "[T]he court considered all required factors of the law."

{¶ 58} Henderson argues that the trial court's sentence exceeds the ten-year sentence requested by the State and defense counsel and the 10-to-12-year sentence sought by the victim. Further, Henderson contends that the trial court must not have appropriately applied the mitigating youth factors because the court did not

impose a lesser sentence that reflected the court's consideration of the factors. Henderson fails to cite any case law to support his position.

{¶ 59} The court clearly stated its familiarity with Henderson's drug use, impulsivity, difficult upbringing, and his Mother's mental-health issues. The court stated it weighed the mitigating youth factors — including brain development, Henderson's age at the time of the offense, his history of trauma, his education, and family and peer pressures — as delineated in R.C. 2929.19(B)(1)(b). Based upon the court's statements throughout the sentencing hearing, we cannot state that the record affirmatively shows the court failed to consider the youth mitigating factors and, accordingly, Henderson's second assignment of error is overruled.

## C. Conceded Error

{¶ 60} Separate from Henderson's assigned errors, the State cites *State v. Beatty*, 2024-Ohio-5684, and concedes that the portion of Henderson's sentence that imposes three consecutive firearm specifications is contrary to law. This issue was not raised in Henderson's appellate brief although he addresses the three consecutive firearm specifications in his reply brief. The trial court sentenced Henderson to three years each on the firearm specifications related to Counts 1 and 2 and one year on Count 6's firearm specification, with all firearm specifications to be served prior to and consecutively to the underlying base terms. The State suggests this sentence is contrary to law pursuant to *Beatty*, and Henderson agrees. We find Count 6's firearm specification sentence is contrary to law, but for other reasons.

{¶ 61} This court addressed the imposition of three consecutive firearm specifications and the precedential value of the *Beatty* decision in *State v. Edwards*, 2025-Ohio-641 (8th Dist.). This court noted that *Beatty* is a plurality opinion with "'questionable precedential value'" and declined to follow the nonbinding authority. *Edwards* at ¶ 112, quoting *State v. Hayes*, 2023-Ohio-4119, ¶ 20 (8th Dist.), and *Edwards* at ¶ 126. We will follow the precedent established in this district.

{¶ 62} In *Edwards*, like here, the relevant question was "whether [a third] firearm-specification prison term imposed at the court's discretion under R.C. 2929.14(B)(1)(g) may be imposed consecutively." *Edwards* at ¶ 123. The *Edwards* Court concluded that "[w]hile the court has discretion under R.C. 2929.14(B)(1)(g) regarding whether to impose an additional prison term for a third firearm specification, if it does impose a prison term, the term is mandatory and must be run consecutively." *Id.* at ¶ 125.

{¶ 63} Here, the firearm specifications associated with Counts 1 and 2 had to be sentenced consecutively. R.C. 2929.14(B)(1)(g). The court then had discretion to sentence Henderson on the Count 6 firearm specification; once the court determined to impose a sentence on the third firearm specification, the sentence was mandatory and had to be run consecutively. *Edwards* at ¶ 125.

{¶ 64} At the sentencing hearing, the trial court correctly instructed Henderson on the Count 1 and 2 firearm specifications and sentenced those specifications to be served consecutively. The court stated that Count 6, attempted grand theft of a motor vehicle, carries a one-year firearm specification "which must

be served prior to and consecutive with the underlying felonies, as well as each of the other two firearm specifications." June 11 hearing, tr. 35. When the court later imposed Henderson's sentence, it stated, "In Count 6, I'm going to sentence you to six months for the [base offense], plus the one-year firearm spec, which must be served prior to and consecutive with the underlying prison sentence, and consecutive with each of the three-year firearm specifications in Counts 1 and 2." June 11 hearing, tr. 62. The court's statements that the third firearm specification had to be imposed in a consecutive nature were contrary to *Edwards* and R.C. 2929.14(B)(1)(g).

{¶ 65} The trial court erroneously sentenced Henderson with the belief that Count 6's firearm specification was mandatory and had to be run consecutively with the firearm specifications in Counts 1 and 2. The trial court did not exercise its discretion to determine whether the facts and circumstances of the case warranted the imposition of Count 6's one-year firearm specification. Only if the court elected to impose a prison term on Count 6's firearm specification did that sentence become mandatory with the requirement that it be imposed consecutively to the other firearm specifications. Accordingly, the trial court's mistaken belief that it was mandated to sentence Henderson on Count 6's one-year firearm specification was error and rendered the sentence on Count 6's firearm specification contrary to law.

{¶ 66} Thus, we vacate the trial court's sentence on Count 6's firearm specification and remand the case for resentencing only on Count 6's one-year firearm specification. *State v. Johnson*, 2008-Ohio-69, ¶ 19-20 (Sentence vacated,

and case remanded for resentencing because the trial court imposed consecutive sentences based upon its mistaken belief that it was statutorily required to do so whereas the court had discretion to determine if the facts and circumstances warranted the imposition of consecutive prison terms.); *State v. Haskins*, 2026-Ohio-19, ¶ 81, 83 (6th Dist.) (Where the trial court erred by imposing sentences for three firearm specifications under the mistaken belief that all three were mandatory, the case was remanded and at the resentencing hearing, the trial court was to "impose consecutive sentences for two of the firearm specifications and use its discretion to determine if it [was] appropriate to impose a sentence for the third firearm specification, as outlined in R.C. 2929.14(B)(1)(g)."); and *State v. Jones*, 2021-Ohio-4117, ¶ 59 (12th Dist.) ("Therefore, because the trial court was under the mistaken belief that R.C. 2929.13(F)(3)(c)(ii) applied to the case at bar, thereby requiring it to sentence Jones to a mandatory prison term, we . . . agree that this matter should be remanded to the trial court for the limited purpose of resentencing.").

{¶ 67} Judgment affirmed in part, vacated in part, and remanded for the limited purpose of resentencing on Count 6's one-year firearm specification.

It is ordered that parties share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
TIMOTHY W. CLARY, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR